First Trial.

## ALBANY OYER AND TERMINER.

## THE PEOPLE agt. CHARLES H. PHELPS.

*Indictment for grand larceny — stealing property belonging to the state.*

Where a draft has been sent to the comptroller of the state for the purpose of paying taxes, the state has such a property in it as that, against a thief, it is properly charged in the indictment against him to be the property of the state.

Where the prisoner having received this property for the treasurer of the state, as the property of the state, and having entered it as the property of the state upon the proper books belonging to the treasurer's office, he is not in a position to set up a want of legal title in the state, the state having thus the actual possession of the property.

Where the indictment charges this draft as belonging to the state, and not to the people of the state, the averment is correct. Under the various statutes of the state this draft is, in fact, the property of the state, the title being vested in the corporate body.

To constitute larceny it is not necessary that the draft should be legally available in the prisoner's hands by proper indorsement. It is enough if the owner has been deprived of a valuable thing, whether the prisoner can legally obtain any benefit from its possession or not.

The statute does not make it depend upon a proper indorsement of the draft to render it valuable, but if, in " any event or contingency," any thing might be collected thereon, then, in that case, it is of the value which the instrument purports to be.

As this draft is personal property, and the taking of it is averred in the indictment, and its value declared, that makes the statement of the statute crime of larceny complete; therefore it is not necessary that the indictment should charge that the amount, which it purports to secure, was the sum actually due thereon.

The prisoner was the simple custodian of the draft for the owner; he received it for the treasurer, and, therefore, for the state; he was the clerk of the treasurer. When he received the draft, which in judgment of law was received by the state in payment of taxes, and passed into

the possession of the treasurer, he, as such custodian, had no discretion to exercise, except, perhaps, as to which one of the banks of deposit it should be placed in, and, when he took and used it, it was larceny in the law, though, when it came into his hands, he may have formed no such intention.

*Indictment for larceny.*

IN announcing the decision of the court, upon the motion by the counsel of the prisoner to instruct the jury to acquit him, judge WESTBROOK said:

This case undoubtedly presents very many grave questions for the consideration of this court, and perhaps for other and higher courts. The questions have been elaborately and carefully discussed upon both sides, and we have endeavored to give them an impartial consideration, during the limited time we have had for that purpose. We have reached a conclusion, and I will proceed to announce that conclusion and some of the reasons therefor very briefly.

It is claimed that the prisoner cannot be convicted under this indictment, because the laws of this state do not recognize this mode of transmission of the taxes due the state, and that consequently neither the state, nor the comptroller as such, nor the comptroller as an individual, nor the treasurer as such, nor the treasurer as an individual, took any property in the draft in question; and that consequently there must be an acquittal of the prisoner, because the title to the property was not in either of the parties or corporations which in the indictment are alleged to be the owners of the draft.

Upon this proposition, we hold that this draft having been sent to the comptroller, for the purpose of paying the taxes, that the state had such a property in it, as that against a thief it is properly charged to be the property of the state. It has been held that where A steals from B, and C again steals from A, that you can charge in the indictment that it is the property of the first thief.

If that proposition be sound, this draft surely can be charged to be the property of a person or corporation, who or which had possession of it by the will of the true owner, if the transfer and possession did not amount to an actual transfer of the title.

As a second answer to the proposition of the prisoner's counsel, we hold that the prisoner having received this property for the treasurer as the property of the state, and having entered it as the property of the state, first, upon the cash book of the daily receipts of the treasurer's office, and, second, upon the book which gives credit to the various counties on account of taxes paid, that he is not in the position to set up a want of legal title in the state, the state having thus the actual possession of the property. Again, if this draft was illegally received in payment of the taxes, and if the state had no right to hold it, then either Mr. Hopkins, the comptroller, or Mr. Raines, who *did* hold it, would hold it for the true owner as trustee. And either would have then such a special property in it, that it could be treated for the purposes of this indictment, as the property of either, as an individual. We therefore decline to hold that the prisoner is entitled to acquittal upon this ground.

The next proposition which is urged is, that the indictment improperly charges this draft as belonging to the state, and that the averment should be that it was the property of the people of the state. Upon this point we hold that it, in fact, is the property of the state, the corporate body. The provision of the constitution of the state to which counsel have referred, relates to the lands of the state; but there is no constitutional provision vesting the title of the personal property belonging to the state in the people. Various statutes, which have been cited by the district attorney upon the argument, refer to the state as the owner of personal property, thus incidentally recognizing the title to personal property as being in the state as such. I will not cite the statutes in detail. They are contained in the very elaborate and carefully pre-

pared brief which the district attorney has prepared, and to which I refer. (*See* 2 *R. S.*, 703, *secs.* 35, 36.)

By a reference to these statutes, it will be seen that by the use of the words "property," "this state," the legislature recognizes the fact that the corporate body, which we call "the state of New York," as such may hold and own property.

But if we deemed this objection more technically right than it is, we should still be constrained to overrule this objection for another reason, and that is, that the statutes provide (2 *vol. Edmonds' Statutes, page* 751, *sec.* 52, *and sub.* 4): "No indictment shall be deemed invalid, nor shall the trial, judgment or other proceedings thereon be affected. \* \* \* 4. By reason of any other defect or imperfection in matters of form, which shall not tend to the prejudice of the defendant."

Whether this draft is .charged to be the property of the state of New York, or the property of the people of the state of New York, is so purely a matter of form that it could not possibly produce any injury to the prisoner.

For these reasons, we hold that the prisoner may be convicted of larceny under this indictment, so far as the objection we have now considered is concerned.

It is also claimed that this draft cannot be the subject of larceny, because it is not a complete instrument; for it was not indorsed by the state treasurer, and also because it was payable to the order of the comptroller, and was not indorsed by him but only by Gallien, the second deputy. Gallien's indorsement is claimed to be informal, because it does not purport to be the act of the comptroller, and also because the second deputy has no power to indorse. We think this objection cannot prevail, for the reason that it assumes, that to constitute a larceny, the property that the thief gets should be legally available in his hands. It is enough, we claim, if the owner has been deprived of a valuable thing, whether the thief can legally obtain any benefit from its possession or not. If he feloniously deprives the owner of it, the offense is

complete. This also, we think, is the meaning of our statute, for when prescribing the rule by which the value of such an instrument can be ascertained, and declaring the amount due thereon to be its value, it adds, "or which in any event or contingency might be collected thereon."

This draft simply requires a proper indorsement to be legal, and the expression used in the statute shows it need not be in that form to be deemed of value, when stolen.

All the argument of the counsel for the prisoner proceeds upon the ground that this draft in the form in which it was taken was without value, being an incomplete instrument. The statute as we have already said, does not make it depend upon that fact; but if in "any event or contingency" any thing might be collected thereon, then, in that case, it is of the value which the instrument purports to be.

The case, also, in 2d of *Leach* (*page* 699), holds this view, although this question was not argued. That was the case of an unindorsed draft or note, which was taken by the confidential clerk who had charge of the drafts. And though it was in an unindorsed shape, the owner never having indorsed it, the prisoner was held to be guilty of larceny. The court decline to hold that the charge of larceny cannot be sustained because the instrument was unindorsed.

It is next argued that the prisoner is entitled to an acquittal; because the indictment is not framed under the statute for the larceny of a note or bill of exchange, inasmuch as it is not charged in the indictment that the amount which it purports to secure was the sum actually due thereon ; nor is there in the indictment any averment that any specific sum was secured thereby. We think this point must be overruled, for the reason that our statute which defines grand larceny, declares it to be the wrongful taking away, without the consent of the owner, of any personal property of greater value than twenty-five dollars. As the draft is personal property, and the taking of it is averred, and its value declared, that makes the statement of the statute crime complete. The provision to

which the counsel has alluded does not designate the crime, but regulates the proof of value to be given on the trial. We do not deem it necessary that the statute evidence of such value should be charged in the indictment. I have been unable, in the brief time I have had, to examine the cases referred to by the district attorney, which he claims decides the question. As an original question, we hold that the indictment is good, under the statute, in the form it now is. The last point is, perhaps, the most difficult of all the questions involved in the case, and that is this: Whether the prisoner, from the position which he occupied and sustained toward this property, can be convicted of the crime of larceny. We think he can be, upon the undisputed and clear facts of the case. We hold, in the first place, that he was not the possessor of the property in the sense in which that word is used by some of the criminal authors, when speaking of the possession of personal property in the hands of an alleged thief, and which possession prevents his conviction of that crime. He was the simple custodian of the property for the owner. He was the clerk of the treasurer. When he received the property for the treasurer, and, therefore, for the state, we cannot but think that the case of *Hutchinson*, which was before the Federal courts and before the state court of Pennsylvania, in effect decides this identical question. When that case (*Hutchinson's*) was before one of the courts of session of Pennsylvania, and was argued by David Paul Brown and Thomas Sergeant for the prisoner, and by Daniel Webster and Mr. Champney for the United States, the court said : " Mr. Russell, in the second volume of his *Treatise on Crimes*, after referring to most of the cases on this subject, in my opinion has drawn a correct deduction from them, and has laid down a clear and intelligible rule, which seems to have been adopted by most of the ancient judges when deciding upon cases of this description. It is in.the following words : ' The correct distinction, in cases of this kind, seems to be, that if the owner parts with the custody only, and not with

the possession, and the prisoner converts the chattel to his own use, it is larceny, although he had no felonious intent at the time he received it; but if the owner parts not only with the custody, but also with the possession of the chattel, and the prisoner converts it to his own use, it will not be larceny, unless the prisoner had a felonious intent at the time he received the chattel.' (2 *Russ.*, 158.)

"Let us, then, apply this rule to the facts now before us. The act of congress declares that the treasurer shall receive and safely keep all moneys which shall be for the use and support of the mint, and pay all moneys due by the mint on warrants from the director. The money, then, was by law in the possession of the treasurer of the mint. He is required to pay all moneys due, on a warrant from the director. It was a possession which that officer could not divest himself of, while the property remained that of the United States, but by a resignation of his office. He, and he alone, is to keep it. The safe keeping is not intrusted to a clerk or assistant, but by law is in the treasurer alone. For the purpose of enabling him to perform all the duties of his office, he employs the defendant as a clerk, and gives to him the custody of a certain sum of the money in his possession for a specific purpose, that of paying the current expenses of the establishment, on warrants drawn by the director, when he, the treasurer, indorsed the warrant. Such, then, was the condition of the parties, that the custody of a certain sum was in the defendant, but the possession in the treasurer, where the law has placed it. This being the state of affairs, the prisoner converting the chattel to his own use is guilty of larceny, although he had no felonious intent at the time he received it."

So in the case before us, in the judgment of law, this draft received by the state in the payment of taxes, was in the possession of the treasurer. Mr. Phelps was but his clerk, who had the custody of it. His instruction in regard to it was specific. He had no discretion to exercise as to the place of deposit, except it may be inferred that he had discretion, per-

haps, as to which one of the banks of deposit it could be placed in. Beyond that he had no discretion. Therefore, when he took this draft and used it, it was larceny in the law, though when it came into his hands he may have formed no such intention.

If, however, it be true that there must be an actual possession of the property on the part of the state, before the prisoner could be guilty of the crime of larceny, we think the evidence in this case abundantly shows that the state did once have possession of this instrument. The officers, treasurer and comptroller, are both officers of the state. Whenever one of these officers received this draft, it would be deemed in law to have been in the possession of the state. And confessedly in this case it was once in the possession of the comptroller, and was handed by messenger or by the second deputy comptroller into the hands of Mr. Phelps, the prisoner. So it had once been in the possession of the state.

But if it shall be deemed only to have been in the possession of the state when it actually was received into its treasury, the proof goes still further, and supplies even that difficulty. When the prisoner received this draft, he entered it first upon the cash-book, which shows the daily receipts of the office, and, secondly, upon the book which contains the credits given to the various counties of the state on account of the taxes paid by them, thus admitting it to be in the possession of the state. It was formally complete, and a written acknowledgement of the possession by the state. It was stronger than the case read yesterday by counsel for the prisoner, where it was admitted that, if the draft taken had been in the till of the drawer of the bank, it would have been larceny. For not only was this in the office of the treasurer of the state, but it was actually entered by the prisoner himself in the books of the state as the property of the state, and belonging to it. The draft was then, therefore, technically in the possession of the state, and when the

prisoner took this property and used it for his own purposes, it was larceny.

And I repeat that it was not at all important that he should have formed an intent to appropriate the draft to his own use, at the time when it first touched his fingers, when he first received it.

It is enough that, at any time when it was in his custody and care, he *feloniously* took it and used it. That makes the crime, in the judgment of the court, complete.

These views which we have expressed seem to us to cover the whole case.

It is, perhaps, unnecessary to add any thing further. But it may not be inappropriate to say, as has been said in the discussion of this case, it surely would be a most unfortunate condition of affairs, if so large an amount of the public moneys belonging to the state could be taken and used by the prisoner for his own benefit, and yet the criminal laws of the state be powerless to reach his offense. It would be remarkable if this was only a mere breach of trust, for which the law provided no adequate or appropriate remedy.

Larceny consists in the felonious taking of another's property against the will of the owner; and applying that broad and common sense definition to the case before us, we see no reason to doubt that, if the facts put in evidence and uncontradicted are true, the prisoner is guilty of the crime wherewith he stands charged.

### CHARGE OF JUDGE WESTBROOK.

*Gentlemen of the jury:* As I do not intend to occupy very much of your time with the charge which I propose to make to you, you can remain seated and I will deliver it in rather an informal manner.

I am not aware, gentlemen, that this court has any feeling in this case, except the feeling to do ample and complete justice to both the prisoner and the people. I am unaware that any wave of popular clamor has reached our ears so as to vary

our conduct one hair's breadth; and I trust that the jury can, at this moment, conscientiously answer such a charge in the same way. It is all important that each case should be determined in the court room, that justice should be administered here in accordance with the evidence given, and the law as laid down by the court. And if ever a different condition of society arises, it will be fearful for the country and for the people. In the administration of justice, however, the court has a responsibility and a duty as well as the jury. And that responsibility should always be discharged unshrinkingly, according to the dictates of conscience; and no court should ever hesitate to pronounce its judgment according as it deems the law to be, without regard to the consequences which may flow from such a decision.

In the administration of justice, the decision of questions of law belong to the court; the decision of disputed questions of fact belong to the jury. The questions of law which this case involves have been disposed of by the court.

They have been disposed of according to its best judgment, and, if the court is wrong, a higher court will rectify the error, but if you should undertake to acquit this prisoner because you think the court is wrong in the law it has laid down, a great public injustice will be done to the people, the consequence of which will be serious here and serious hereafter. The facts of this case are, in brief, these: On the 7th of August, 1873, Mr. S. Curtis Lewis, treasurer of the county of Niagara, undertook to pay to the state $7,500 of the taxes due from that county. He sent it on in the shape of a draft for that amount, purporting to be drawn by the Farmers and Mechanics' Savings Bank of Lockport, upon the Central National Bank of New York. It was payable to his order as treasurer, and by him indorsed to Nelson K. Hopkins, comptroller, or order. This draft thus sent by him was received by the comptroller, and from the comptroller's office it was undertaken, at least, to be transferred to the treasurer by an indorsement, which is substantially in these words:

"Pay to Thomas Raines, treasurer, or order. Henry Gallien, second deputy comptroller." When thus indorsed, it was either handed to Mr. Phelps, who was a clerk in the office of the treasurer, by Mr. Gallien personally, or by a messenger from the office of the comptroller. Mr. Phelps having received it, as he unquestionably had a right to do, entered this draft among the daily cash receipts of the treasurer's office, upon a book kept in the office for that purpose. He also made a second entry upon another book, for the purpose of giving the county of Niagara a credit for the payment of that sum on account of its taxes due the state. Thus the state acquired the possession of this property. It was entered upon its books as the property of the state by the prisoner himself. His duty, then, was plain and clear, and that was to deposit that draft in one of the state banks of this city, which had been designated as depositories of the public funds. In place of doing this, as the undisputed evidence in the case shows, he made an indorsement of this character on the draft : "Pay to Charles Hudson, cashier, or order. State treasurer, per C. H. Phelps, cashier," and then remitted that draft to Frank R. Sherwin, whose cashier Hudson was; it was then deposited in the Bank of North America to the credit of Sherwin, so that the funds which this draft represents have been drawn and paid out, not into the treasury of the state, but where he has directed and ordered it to be paid. Now, the question which these facts presents is this: Is this or can it be a larceny ? The court charges this as the legal proposition which will control and govern your conduct. If you are satisfied from the evidence, that Charles H. Phelps sent this draft to New York for the purpose of converting it to his own use, he is guilty of the crime charged in the indictment ; and I may add here that not only is there this evidence of its having been sent to New York and paid to the credit of F. R. Sherwin in the Bank of North America, but the admission of the counsel for the prisoner is that it was not deposited in either of the banks designated as the

depositories of the state money. It is further shown in the case that, when Mr. Phelps was in New Jersey, he stated he was unable to make up his deficiency. When he was asked what amount of money would cover this deficiency, whether $200,000 would cover it, he said he was unable to answer that question until he could refer to certain memoranda that were in the office of the state treasurer. He also said that, if he could be guaranteed his freedom for the space of thirty days he could return the most of the money, and if he could be guaranteed freedom for a longer period of time, some two months, he thought he would be able to restore all. He then professed to have part of the money under his control, but refused to tell where it was, or to restore it to the officer of the state who was then there for the purpose of making inquiries about it.

Upon the evidence you are to find, first, whether or not these facts are true, or rather, more correctly speaking, you are to find, from the evidence in the case, whether the facts I have just stated be true, and, in the next place, you are to find what he intended by this. I concede that the question of intent is a question of fact for the jury, but, gentlemen, we judge of intent always, as has been well said, from what a person does. If a person puts his hand into your pocket and takes your pocketbook, and uses the money that is in it, refusing to restore it, what conclusion can you draw from it? If a clerk in the office of an employer takes from the till or money drawer, money, and uses it, and refuses to restore it, what inference can you draw? It cannot be any defense if the person takes the money intending at some future day to restore it. Such a discretion as that can never be committed to the unlawful taker of money. And it would be dangerous in the extreme to hold that, because the person who actually takes money says " I mean to return it," he did not mean to steal it.

It is necessary for you to understand that this draft could not be returned, and the money, or a part of it, he could not

restore when called upon, and the remainder he declined to tell where it was. Now, as a matter of fact, in the administration of justice, I must leave to you to find this question of intent, and I leave it to you; but I further say to you that, upon this evidence, there seems to be no material dispute, and you have no right willfully to disregard plain, sworn, uncontradicted evidence.

I further, charge you, gentlemen, that the prisoner had no legal possession of the draft, but simply the custody thereof, and whenever he took it for the purpose of appropriating it to his own use, he is guilty of the crime of larceny. It is a matter of no consequence whether Mr. Raines did or did not do irregular acts in his office. It is a matter of no consequence whether it was improper for Mr. Raines to take his salary in advance, if he did so. It is a matter of no consequence whether he properly or improperly ordered funds to be sent to him at Rochester, while he sent drafts here to pay for them.

It would make no difference in the disposition of this case if Mr. Raines (of which there is no proof) had himself stolen money. An irregularity by one man cannot justify, extenuate or excuse a felony committed by another. Each transaction must stand or fall by itself. The court has not held that, if Mr. Raines had taken the money of the state and spent it, that he could not be tried for larceny.

That question is not before the court here now, and, whenever that question does come, if it ever does, it will be met, and will probably be held contrary to the opinion of the district attorney, if the court is organized as now. Suppose it was true that Mr. Raines had been guilty of any irregularities in the office, it did not justify or extenuate the acts of the prisoner, if he has done that with which he stands charged, and which uncontradicted evidence proves. Neither is it necessary that the prisoner should have formed the intent to steal and appropriate this draft when it first came into his hands. It is enough that he formed the intent to convert it to his own use at any time, and actually did so.

From all the evidence in the case, the character of his custody did not make him a possessor of the money in such a sense that the taking would not be larceny. Upon this proposition the court is clear, and so charge the law to be.

It has also been argued to you that, because this draft was unindorsed, it is an important question as bearing upon the question of intent to steal. I do not so consider or regard it. If there be any question of fact in that connection I leave it to you. As matter of law, I charge you, that an unindorsed draft or note is capable of being stolen. As, for example, I give you my note and make it payable to your order, and you put it away in your house without writing your name upon the back. That note is your property, and if a man should go into your dwelling and take it therefrom and appropriate it to his own use, he would be guilty of the crime of larceny. Whether it would be grand or petit larceny, would depend upon the amount due upon the note. If it was more than twenty-five dollars, he would be guilty of grand larceny; if less, petit larceny.

Whether or not this man could legally part with this note is not an important question, and whether he thought he could legally part with it is not important. The question is: Did he intend to take it and convert it to his own use, and did he take it and convert it to his own use? If he did, then he is guilty of the crime wherewith he stands charged.

This is all I expect to say to you about this case. The court can have no more feeling than you in regard to it. The court does not blame counsel for the prisoner for the zeal with which he has addressed you; it is natural and pardonable, but his feelings should not be shared by you or by the court. We are not partisans, but the administrators of the law, charged with solemn and grave duties, which we should see honestly and fearlessly discharged. The question for you to pass upon is: Did the prisoner take this draft with the intent to convert it to his own use? Does the evidence satisfy you that he did?

If he did, you are to pronounce him guilty of the offense wherewith he stands charged.

Of course, it is unfortunate that when a person commits crime, others may be affected. The axe of justice some times falls with crushing force upon those who are near and who are not involved in the relative's guilt, but that must not prevent its fall. Public order, more or less, and the welfare of other families can only be maintained by a rigid, strict and impartial administration and execution of the law.

Gentlemen, I give the case into your hands, not doubting that you will render such a verdict as the facts of the case require.